IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AGNES CARVEL ESTATE      :
by PAMELA CARVEL       :
                :
  Plaintiff          :
                :  C.A. No. 07-237-JJF
v.               :
                :
CARVEL CORP.        :
                :
  Defendant        :

### AFFIDAVIT OF ANTHONY P. ASHTON

I, ANTHONY P. ASHTON state as follows:

1.  I am over eighteen years old and am competent to testify to the facts and matters set forth in this Affidavit.

2.  I am an attorney with the law firm DLA Piper US LLP and counsel to the Defendant Carvel Corporation in the above-captioned matter.

3.  Attached hereto as Exhibit A is a true and correct copy of a June 11, 2007, Approved Judgment from the High Court of Justice, Chancery Division in London and a June 13, 2007 Order.

**I DECLARE UNDER THE PENALTY OF PERJURY THAT TO THE BEST OF MY KNOWLEDGE THE FACTS AND MATTERS SET FORTH ABOVE ARE TRUE AND CORRECT.**

DATE: August 16, 2007            _____

                      Anthony P. Ashton

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on August 16, 2007, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Pamela Carvel
> 28 Old Brompton Road, Suite 158
> London SW7 3SS England

Additionally, I hereby certify that on August 16, 2007, copies of the foregoing document were served via first class mail, postage pre-paid to the above party.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Karen L. Pascale*

Karen L. Pascale (No. 2903)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6554
kpascale@ycst.com

# EXHIBIT A



Neutral Citation Number: [2007] EWHC 1314 (Ch)

Case No: HC06C03337

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 11 June 2007

Before :

**MR JUSTICE LEWISON**

- - - - - - - - - - - - - - - - - - - - -

Between :

| THE THOMAS AND AGNES CARVEL FOUNDATION | **Claimant** |
| - and - | |
| (1) PAMELA CARVEL | |
| (2) CARVEL FOUNDATION, INC. | **Defendants** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr Francis Barlow QC** (instructed by **Herbert Smith LLP**) for the Claimant
**Mr Michael Gibbon** (instructed by **Penningtons**) for the First Defendant
**Mr Jeremy Dable** for the Second Defendant

Hearing dates: 23, 24 May 2007

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

*Kim Lewison*

THE HONOURABLE MR JUSTICE LEWISON

**Mr Justice Lewison :**

Introduction ............................................................................................................... 2
The underlying facts ................................................................................................. 2
The law ...................................................................................................................... 5
    Jurisdiction ............................................................................................................ 5
    Discretion ............................................................................................................. 12
Application to set aside ........................................................................................... 15

**Introduction**

1.      The Claimant, The Thomas and Agnes Carvel Foundation, seeks a summary order (a) replacing the First Defendant, Pamela Carvel, currently sole personal representative of Agnes Carvel deceased, with a neutral, independent professional person pursuant to section 50 of the Administration of Justice Act 1985 or section 1 of the Judicial Trustees Act 1896; and (b) setting aside orders obtained by Pamela Carvel in the Chancery Division for the payment to her of over £8 million out of Agnes Carvel's estate. Mr Francis Barlow QC appears for the claimant. Mr Michael Gibbon appears for Pamela Carvel and Mr Jeremy Dable for the second defendant, which is the named residuary beneficiary under Agnes Carvel's last will.

2.      The underlying facts are not in any real dispute; and I take the narrative largely from Mr Barlow's full and helpful written argument.

**The underlying facts**

3.      The late Thomas Carvel ("Thomas") made a large fortune in the ice cream business in the USA. He died in 1990, and his wife Agnes Carvel ("Agnes"), died in 1998. Thomas and Agnes had no children. Pamela Carvel ("Pamela") was Thomas' niece and Agnes' niece by marriage.

4.      On 13 February 1988 Thomas and Agnes executed mutual, mirror-image wills. By her 1988 Will (the "1988 Will") Agnes left her estate on trust for Thomas if surviving for life with remainder on trust for The Thomas and Agnes Carvel Foundation (the "Foundation"). Thomas' 1988 Will was in similar form. The Foundation is a not-for-profit corporation incorporated in 1976 in the State of New York. By a simultaneous agreement (the "Reciprocal Will Agreement") Thomas and Agnes agreed that during their joint lives they would make no gratuitous transfers of property nor alter the provisions of their 1988 Wills without the consent of the other and that the survivor would make no such gratuitous transfers or alterations. Thomas died on 21st October 1990. His 1988 Will was admitted to probate in New York by the Surrogate's Court of the State of New York, County of Westchester; and seven executors, including Agnes and Pamela, were appointed to administer his estate. The Surrogate's Court is the court of probate for the State of New York.

5.      Following Thomas' death, Agnes, in the belief that her 1988 Will had been lost, made a further will on 21 November 1990 (the "1990 Will"). Apart from the omission of the life interest in favour of Thomas the terms of Agnes' 1990 Will were essentially identical with those of the 1988 Will. It, too, left Agnes' residuary estate to the

Foundation. On 22 April 1991 Agnes created a revocable trust known as "The Agnes Carvel 1991 Trust" (the "1991 Trust") under which Agnes took a life interest in the trust fund with remainder on her death upon trust to pay her funeral and administration expenses and debts and subject thereto upon trust for the Foundation or some other charitable trust or corporation to be created by the Trustees. Agnes subsequently transferred property of substantial value to the 1991 Trust.

6.      On 7 July 1995 Agnes made a new will (the "1995 Will") revoking all former wills, appointing Pamela her sole executrix and bequeathing her residuary estate to the Second Defendant Carvel Foundation, Inc. ("Carvel-Florida"). Carvel-Florida is a not-for-profit corporation which was incorporated in Florida by Pamela and Agnes on the same day as the 1995 Will was executed. Pamela was a founding director of Carvel-Florida and following Agnes' death in 1998 became the registered agent and thus the person primarily responsible for accepting service of process on behalf of the corporation. Pamela resigned from both positions in March 2003.

7.      In March 1995 Pamela and Agnes moved to London. The circumstances in which they did so are contentious, but do not matter on this application. Agnes died in London on 4 August 1998. On 2 October 1998 Pamela obtained probate of the 1995 Will from the Principal Probate Registry. The terms of the grant show that in applying for probate Pamela adopted the "excepted estates" procedure. Under the prevailing regulations (The Capital Transfer Tax (Delivery of Accounts) Regulations 1981 as amended) this procedure was available in a case where (among other things):

(1)  the deceased died domiciled in the United Kingdom;

(2)  the value of that person's estate was wholly attributable to property passing under his will or intestacy (or under a nomination taking effect on death or by survivorship);

(3)  not more than £50,000 represented value attributable to property situated outside the jurisdiction; and

(4)  the gross value of the estate (including chargeable transfers) did not exceed £200,000.

8.      In order to obtain probate Pamela swore an oath that the conditions were satisfied. She says that she believed they were. I am not in a position to find that she is not telling the truth; although her belief, if true, was naïve. The effect of the regulations is that, in cases to which they applied, it was not necessary to provide an account to the Inland Revenue.

9.      In August 1998, within days of Agnes' death, the Foundation instituted proceedings in the Westchester Surrogate's Court to enforce the Reciprocal Will Agreement and to avoid certain pre-death transactions alleged to have been shams; and also alleged to have been effected with Pamela's connivance in violation of that agreement.

10.     Agnes' estate was represented in those proceedings by Leonard Ross, a New York attorney. According to a witness statement that he subsequently made, he had been designated by Pamela as an ancillary administrator; and his appointment as ancillary administrator was accepted by the Westchester Surrogate's Court on 18 August 1999. Under New York law Pamela, as a foreign fiduciary, could not represent the estate in New York. However, Pamela was a party to the action in two capacities: in her

personal capacity and as Trustee of the Realities Trust, an entity to which property had been transferred and to which the Foundation claimed title by virtue of the Reciprocal Will Agreement. These proceedings culminated in a Decision After Trial dated 1 April 2002 given by Surrogate Scarpino. I will return to what the Surrogate decided in due course; but in summary he held (i) that the Reciprocal Will Agreement was valid and enforceable, (ii) that the execution of the 1990 Will and the 1991 Trust were not breaches of the Reciprocal Will Agreement, (iii) that the execution of the 1995 Will "contravenes the estate plan created in 1988 and clearly constitutes a total breach, of the Reciprocal Agreement" (iv) that the Foundation was entitled to receive the assets of Agnes' estate subject to the payment of reasonable debts and administration expenses and (v) that the Foundation was entitled to a transfer of those assets that had been transferred to the Realities Trust. The Surrogate's decision was embodied in a decree dated 8 July 2002 and was affirmed by the Appellate Division of the Supreme Court of New York.

11.    On 13 June 2003 Pamela in her personal capacity, and acting as a litigant in person, issued a Claim Form in the Chancery Division of the High Court in England against herself as sole defendant in her capacity "as Executor of the Estate of Agnes Carvel" claiming the sum of £6,640,897.79 together with accrued interest of £1,148,827.90 and continuing interest at the daily rate of £1,455.54 until payment. The claim was based on three categories of expense:

   i)      Sums which Pamela said she had incurred on behalf of Agnes during her lifetime;

   ii)     Debts which Agnes had contracted but had not paid; and

   iii)    Sums which Pamela had incurred as Agnes' personal representative and in respect of which she claimed to be entitled to indemnity from the estate.

12.    By Order dated 24th July 2003 Deputy Master Behrens ordered Carvel-Florida to be joined as a defendant in place of Pamela. By Order dated 8th January 2004 Deputy Master Weir ordered Carvel-Florida, on its own admission of the full amount of the sum claimed, to pay to Pamela the sum of £8,085,095.51 together with £800 costs. Carvel-Florida's admission of liability was signed by Pamela's mother Linda Carvel. By order dated 6 May 2004 Master Price amended Deputy Master Weir's Order by providing that the sum of £8,085,095.51 be paid from Agnes' estate upon Carvel-Florida "as residuary beneficiary appointed to represent the said estate" consenting to the Order. The Chancery proceedings were issued and the Chancery order obtained after the Surrogate's decision and decree declaring that the Reciprocal Will Agreement was enforceable, that the 1995 Will was a "total breach" of that Agreement and that the Foundation was entitled to receive Agnes' estate; and after the Surrogate had ordered the fiduciaries of Agnes' estate to perform her contract.

13.    On 14th April 2005 Pamela petitioned the Florida Circuit Court for the County of Broward, a court with no previous experience of the Carvel estate litigation, for an order "domesticating" (or registering) the Chancery Order. By the Petition Pamela petitioned in her personal capacity and stated on oath that the Chancery Order was final and conclusive in the United Kingdom, that there was no appeal pending, that no opposition to the recording of the Chancery Order had been returned by the Broward County Administrator and that Carvel-Florida had been appointed to represent the

estate and had consented to the Order. By Order dated 10th May 2005 and made in favour of Pamela personally the Circuit Court for Broward County ordered that the Chancery Order be treated as a judgment of that Court.

14. Pamela did not give notice to the Foundation of the Chancery proceedings in England or any of the orders made in those proceedings; or indeed of the petition to domesticate the order.

15. On 26 August 2005 Pamela, again without notice to the Foundation and without notice to Mr Ross (who was still the ancillary administrator of the estate in New York), registered the domestication order with the Supreme Court of New York for Nassau County, another court which had had no previous dealings with Agnes' estate.

16. On 29th August 2005 the Court issued a writ of execution against the estate of Agnes in the sum of US$15,929,214.15 (the dollar equivalent of the sum payable under the Chancery order). The writ of execution directed to the Sheriff in favour of Pamela personally was subsequently served on The Bank of New York and the firm of Edward Jones, which both held assets on behalf of the estate collectively worth in excess of US$9 million. The Bank of New York and Edward Jones refused to release the funds without a "turnover order" (a formal order of the court confirming their liability to release the funds). Pamela accordingly issued a petition in which she stated on oath that "the estate of Agnes" had received notice of the Domestication Order and did not oppose it. No notice of this petition was given to the Foundation or to Mr Ross.

17. On 29 December 2005 the Court for Nassau County issued a temporary restraining order prohibiting Pamela from enforcing the Chancery order and subsequently transferred the proceedings to the Surrogate's Court. Also on 29 December 2005 the Surrogate's Court issued a temporary injunction in similar terms. On 30 December 2006 the Foundation intervened in the proceedings in the Court for Broward County and obtained a stay of the domestication order on 10 January 2006. The Order was vacated on 31 January 2006. Despite the temporary restraining orders issued by the Florida Court, the Court for Nassau County and the Surrogate's Court Pamela, on 20 January 2006, registered a copy of the Chancery Order in the Federal District Court for the Eastern District of New York. She did not disclose the existence of the restraining orders. Nor did she give prior notice to the Foundation or Leonard Ross. Her application was dismissed on 29 March 2006.

**The law**

*Jurisdiction*

18. The court has no inherent jurisdiction to remove a personal representative: *Re Ratcliff* [1898] 2 Ch 352 at 356. The traditional remedy was an administration action. But an administration action was (in the words of the Law Reform Committee's 23rd Report) "an extremely clumsy, costly and time consuming procedure and in practice it is only in exceptional cases that it can be recommended". However, once the estate has been administered, the personal representative becomes a trustee; and at that stage the court's inherent jurisdiction to control trusts arises: *Re Smith* (1880) 42 Ch D 302. A power to remove a personal representative was introduced by the Judicial Trustees Act 1896. But the practice and procedure under the 1896 Act was also considered to

be cumbersome and over-formal, with the result that a new power to remove a personal representative was introduced by section 50 of the Administration of Justice Act 1985.

19.     The relevant parts of that section read as follows:

> "(1)     Where an application relating to the estate of a deceased person is made to the High Court under this subsection by or on behalf of a personal representative of the deceased or a beneficiary of the estate, the court may in its discretion—
>
> (a)     appoint a person (in this section called a substituted personal representative) to act as personal representative of the deceased in place of the existing personal representative or representatives of the deceased or any of them; or
>
> (b)     if there are two or more existing personal representatives of the deceased, terminate the appointment of one or more, but not all, of those persons.
>
> ...
>
> (4)     Where an application relating to the estate of a deceased person is made to the court under subsection (1), the court may, if it thinks fit, proceed as if the application were, or included, an application for the appointment under the Judicial Trustees Act 1896 of a judicial trustee in relation to that estate.
>
> (5)     In this section "beneficiary", in relation to the estate of a deceased person, means a person who under the will of the deceased or under the law relating to intestacy is beneficially interested in the estate."

20.     The application is formally made under section 50. However, as an alternative Mr Barlow also relies on section 1 of the Judicial Trustees Act 1896, either through the gateway provided by section 50 (4); or as an original application under the 1896 Act. The relevant provisions of section 1 of the 1896 Act read as follows:

> "(1)     Where application is made to the court by or on behalf of the person creating or intending to create a trust, or by or on behalf of a trustee or beneficiary, the court may, in its discretion, appoint a person (in this Act called a judicial trustee) to be a trustee of that trust, either jointly with any other person or as sole trustee, and, if sufficient cause is shown, in place of all or any existing trustees.
>
> (2)     The administration of the property of a deceased person, whether a testator or intestate, shall be a trust, and the executor or administrator a trustee, within the meaning of this Act.
>
> ...

(7)    Where an application relating to the estate of a deceased person is made to the court under this section, the court may, if it thinks fit, proceed as if the application were, or included, an application under section 50 of the Administration of Justice Act 1985 (power of High Court to appoint substitute for, or to remove, personal representative)."

21.    The first question is: who is entitled to apply under these sections? So far as section 50 is concerned, the answer so far as this case is concerned, is: a person who "under the will of the deceased" is beneficially interested in the estate. The natural meaning of the quoted phrase is a person named in (or one of a class identified in) the will which has been admitted to probate. That, after all, will be the will in relation to which the impugned personal representative has been appointed. Moreover, the use of the definite article ("the" will) seems to me to presuppose that there is only one relevant will. The Foundation is not, however, named in Agnes' 1995 will as a beneficiary. It claims its beneficial entitlement under the doctrine of mutual wills.

22.    Mr Barlow submitted that "the will" in section 50 (4) could be read as "a will"; or that "the will" meant the *operative* will in the sense that it controlled the devolution of the deceased's estate or part of it. Accordingly, he said, although the Foundation was not named as a beneficiary in the 1995 will, its entitlement derived from one or more of Agnes' previous wills, which she had agreed not to revoke. I do not agree that "the" will can be read as "a" will. A will that has never come into operation has no legal effect at all. To give such an extended meaning to the phrase would go far beyond what Parliament can be supposed to have intended. I am inclined to agree that "the will" means "the operative will", but it must mean the operative will of the deceased whose personal representative is sought to be removed. So, it still leaves open the question: does the Foundation claim under any will of Agnes?

23.    So far as English law is concerned, the doctrine of mutual wills is founded on the principle stated by Lord Camden in *Dufour v. Pereira* (1769) Dick. 419:

"The instrument itself is the evidence of the agreement; and he, that dies first, does by his death carry the agreement on his part into execution. If the other then refuses, he is guilty of a fraud, can never unbind himself, and becomes a trustee of course. For no man shall deceive another to his prejudice. By engaging to do something that is in his power, he is made a trustee for the performance, and transmits that trust to those that claim under him."

24.    In *Re Hagger* [1930] 2 Ch 190 Clauson J amplified the principle:

"To my mind *Dufour v. Pereira* decides that where there is a joint will such as this, on the death of the first testator the position as regards that part of the property which belongs to the survivor is that the survivor will be treated in this Court as holding the property on trust to apply it so as to carry out the effect of the joint will. As I read Lord Camden's judgment in *Dufour v. Pereira* that would be so, even though the survivor did not signify his election to give effect to the will by taking

> benefits under it. But in any case it is clear that Lord Camden
> has decided that if the survivor takes a benefit conferred on him
> by the joint will he will be treated as a trustee in this Court, and
> he will not be allowed to do anything inconsistent with the
> provisions of the joint will."

25.    Although these cases were concerned with joint wills, the same principle applies to
       mutual wills. As Snell puts it (para 22-34):

> "Any will which the surviving testator may make to replace the
> first will will be valid. The agreement cannot make the first will
> irrevocable. His personal representative will, however, take the
> property subject to the trust arising under the prior agreement."

26.    In *Birmingham v Renfrew* (1937) 57 CLR 666 Latham C.J described it as "a trust
       which is declared by the law to affect the conscience of [the survivor's] executor and
       of the volunteers who are devisees or legatees under his will."

27.    The essential point, to my mind, is that the trust does not arise under the will of the
       surviving testator. Nor does it arise under any previous will of the surviving testator.
       It arises out of the agreement between the two testators not to revoke their wills, and
       the trust arises when the first of the two dies without having revoked his will. In so far
       as there is an "operative will", it seems to me that it is the will of the first testator (and
       his death with that will unrevoked) which brings the trust into effect. That being so, I
       do not consider that a person who claims under the doctrine of mutual wills is a
       person beneficially interested in the estate *under the will of the deceased*. It follows,
       in my judgment, that no valid application can be made by such a person under section
       50 of the Administration of Justice Act 1985.

28.    Section 1 of the Judicial Trustees Act 1896 defines neither a trust nor a beneficiary.
       Mr Gibbon said that the jurisdiction under the 1896 Act was co-extensive, so far as
       estates are concerned, with that under section 50 of the 1985 Act. I do not see why
       that should be so; nor do I consider that there is any presumption to that effect. The
       jurisdictions may overlap, but there is no reason why they should be co-extensive. In
       *Re Marshall's Will Trusts* [1945] Ch 217 Cohen J said that the word trust was to be
       given its ordinary meaning; and he adopted, as its ordinary meaning, the definition
       then to be found in Underhill on Trusts:

> "A trust is an equitable obligation, binding a person (who is
> called a trustee) to deal with property over which he has control
> (which is called the trust property) for the benefit of persons
> (who are called the beneficiaries or cestuis que trusts), of whom
> he may himself be one, and any one of whom may enforce the
> obligation."

29.    As Clauson J made clear the survivor of two persons who make mutual wills is treated
       as a trustee, and as Lord Camden said the trust binds those who claim under him.
       Accordingly, in my judgment the survivor and his executor are trustees in the usual
       sense of that word. A person entitled to enforce the trust thus imposed by law is, in
       my judgment, a beneficiary. In my judgment, therefore, although a person claiming
       under the English doctrine of mutual wills is not entitled to make an application under

section 50 of the Administration of Justice Act 1985, he is entitled to apply under section 1 of the Judicial Trustees Act 1896. If that is wrong, then I consider that the personal representative administering the estate of the survivor of two testators who made mutual wills is a trustee for the purposes of the 1896 Act, by reason of the extended definition in section 1 (2); and the person who claims to be entitled under the doctrine of mutual wills is interested in the assets being so administered, and is therefore a beneficiary for the purposes of the 1896 Act.

30.   Mr Barlow rightly accepted that a mere creditor of the estate could not be said to be a beneficiary of the estate; and consequently had no standing to apply for the removal of a personal representative. So it is necessary at this stage to consider what Surrogate Scarpino decided about the status of the Foundation. Mr Gibbon warned me against reading the Surrogate's decision by the light of nature, because there was no evidence of the law that he applied, nor of the procedures which governed proceedings in the Surrogate's Court. However, it seems to me that if there was to be any challenge to the usual presumption that foreign law is the same as English law, the burden would have been on Pamela to take up that challenge by evidence. There was none.

31.   The Surrogate's essential reasoning on the Reciprocal Will Agreement is contained in pages 20 and 21 of his written judgment. He said (omitting citation of authority):

> "The Foundation is correct that agreements, such as the Reciprocal Agreement, are enforceable in equity. It is also correct that the Court may not set up Agnes' 1988 or 1990 will as her last will and testament. However, the Foundation's contention that the equitable remedy for breach of the Reciprocal Agreement is to deem it a creditor of Agnes' estate is correct only to the extent of Agnes' residuary estate. The proper remedy is an order directing the fiduciary to perform the obligation which the testator had assumed. Agnes' obligation under the Reciprocal Agreement was to name the Foundation as the residuary beneficiary of her estate. Accordingly the Foundation's remedy is to receive the residue of Agnes' estate. This was the relief accorded in [an earlier case] where the beneficiaries under the decedent's later will were deemed to hold half of her estate as a resulting trust in favor of the husband's relatives – those who, though the beneficiaries of the joint will, were cut out by the wife's later will."

32.   It is true that there is a reference to the Foundation being deemed to be a "creditor" of Agnes' estate. But the remainder of the Surrogate's reasoning shows clearly, to my mind, that he was deciding that the Foundation was beneficially entitled to the residuary estate itself. First he said that the Reciprocal Will Agreement was enforceable in equity. It is not therefore a case of debt or damages which would make someone a creditor of the estate. Second, the order is an order directing the fiduciary to perform the testator's obligation. This is not an order sounding in money; but an order of specific performance. Third, he said that the Foundation's remedy was to receive Agnes' residuary estate. If it is entitled to receive the residue of the estate, it is hard to see how it is not beneficially entitled to it. Fourth, the justification for the Surrogate's conclusion is a reference to authority in which it was held that a resulting trust had arisen. Plainly the disappointed beneficiary was a beneficiary under that

resulting (or, as we would perhaps say, constructive) trust. In addition the decree which embodied his decision was an order directing the fiduciaries of the estate to perform the contract of the deceased; and not a money judgment. In my judgment the Surrogate clearly decided that the Foundation was beneficially entitled to Agnes' residuary estate.

33. The next question is whether the Foundation can rely on the Surrogate's decision in these proceedings.

34. The Foundation is not attempting to enforce the Surrogate's decree. Rather, it is relying on his decision to establish an issue estoppel as against Pamela to the effect that it is a beneficiary of the estate. A foreign judgment will give rise to an issue estoppel in subsequent English proceedings if (i) the judgment is a final and conclusive judgment on the merits of a court of competent jurisdiction, (ii) the issue in question is the same and was necessary for the decision of the foreign court; and (iii) the parties to the English litigation are the same parties (or their privies) as in the foreign litigation.

35. It is common ground that the Surrogate's Court was a court of competent jurisdiction; that the Surrogate's decision was a decision on the merits, and that it is final and binding. The issue that the Surrogate decided was that the Reciprocal Will Agreement was binding, with the consequence that the Foundation was beneficially entitled to Agnes' residuary estate. That is the same issue as that on which its entitlement to apply under the Judicial Trustees Act depends. The contentious issue was whether the parties to the litigation are the same parties (or their privies) as in the foreign litigation.

36. In *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510 Megarry V-C said at page 515:

> "Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest.' "

37. This test was approved by the House of Lords in *Johnson v Gore Wood & Co* [2002] 2 AC 1.

38.  As I have said, Pamela was a party to the litigation before the Surrogate; but not in her capacity as Agnes' personal representative. The reason why she did not appear in that capacity was because Agnes' estate was represented by the ancillary administrator, Mr Ross. The issue before the Surrogate was whether the Reciprocal Will Agreement was binding on Agnes; and through her on her fiduciary. Agnes' fiduciary in New York was Mr Ross; and her fiduciary in England is Pamela. Mr Gibbon pointed out that there was now considerable hostility between Pamela and Mr Ross. I do not consider that that matters. What matters is that they represent the same estate, whether they do so amicably or at each others' throats. Since both are fiduciaries in relation to the same estate; and both ultimately derive their authority from the same will I consider that there is a sufficient degree of identification between the two as to make it just to hold that the decision to which Mr Ross was party as ancillary administrator binds Pamela as personal representative. The fact that Pamela participated in the proceedings in her personal capacity and as trustee of the Realities Trust, and advanced arguments in opposition to the Foundation, adds to the justice of treating her as bound by the Surrogate's decision, even if that would not be enough on its own.

39.  On the basis that Pamela is bound by the Surrogate's decision, is Carvel-Florida also bound? Carvel-Florida was not formally a party to the proceedings before the Surrogate. However, Pamela was throughout a director and the registered agent of Carvel-Florida. In my judgment Carvel-Florida is also a privy for the purposes of issue estoppel. As I have said, the Surrogate decided that the Reciprocal Will Agreement bound Agnes as from the time that Thomas died. Her personal obligation was to nominate the Foundation as the residuary beneficiary under her will; and the effect of her not having done so was to make the Foundation beneficially entitled to her residuary estate. Carvel-Florida can have no better claim than Agnes, through whom it claims. In my judgment that is enough to make Carvel-Florida a privy. Mr Barlow also had a second string to his bow. He relied on the principle stated by Lord Penzance in *Wytcherley v. Andrews* (1871) L. R. 2 P. & D. 327, 328.

> "There is a practice in this court, by which any person having an interest may make himself a party to the suit by intervening; and it was because of the existence of that practice that the judges of the Prerogative Court held, that if a person, knowing what was passing, was content to stand by and see his battle fought by somebody else in the same interest, he should be bound by the result, and not be allowed to re-open the case. That principle is founded on justice and common sense, and is acted upon in courts of equity, where, if the persons interested are too numerous to be all made parties to the suit, one or two of the class are allowed to represent them; and if it appears to the court that everything has been done bona fide in the interests of the parties seeking to disturb the arrangement, it will not allow the matter to be re-opened."

40.  Although the principle originated in probate proceedings, it is not confined to them: *Nana Ofori Atta II v. Nana Abu Bonsra II* [1958] A.C. 95. In *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241 Stuart-Smith LJ said that "justice and common sense" did not require it to be confined to probate actions. It is inconceivable that, through Pamela, Carvel-Florida did not know about the proceedings in the Surrogate's

Court. However, it is here that Mr Gibbon's point about my lack of knowledge of procedure in the Surrogate's Court has force. It will be seen that Lord Penzance's statement of principle is predicated on the ability of the party estopped to be able to make himself a party to the suit. I do not know whether that option would have been open to Carvel-Florida; so in my judgment it would be unsafe for me to base my decision on that ground. But one ground is enough.

41.     Mr Gibbon said that if a person was not entitled to apply under section 50 of the Administration of Justice Act 1985, the gateway to proceeding under the Judicial Trustees Act by virtue of section 50(4) remained firmly locked. The argument was that an "application under subsection (1)" meant a *valid* application. However, it is not always the case that an "application" referred to in a statute must be a valid application in the sense of an application that will succeed: compare *Zenith Investments (Torquay) Ltd v Kammins Ballrooms Co Ltd* [1971] 1 WLR 1751. One of the purposes of giving the court the power to proceed under the 1896 Act when the applicant has applied under the 1985 Act is, in my judgment, to enable the court to cure what are effectively purely procedural defects. If I am wrong about that, then Mr Barlow said that he would amend the application to claim relief in an original application under the 1896 Act. Mr Gibbon did not suggest that Pamela would suffer any prejudice if such an application were made. If necessary I would have permitted the amendment.

42.     I hold therefore that the Foundation is entitled to make its application under the Judicial Trustees Act 1896.

*Discretion*

43.     Having held that I have jurisdiction, the next question is whether I should exercise it in the Foundation's favour. I should say that Carvel-Florida opposes the application. It says that Pamela has proved to be a doughty champion of Agnes' estate and that another personal representative would not have her tenacity. Pamela herself also opposes the application.

44.     It is common ground that, in the case of removal of a trustee, the court should act on the principles laid down by Lord Blackburn in *Letterstedt v Broers* (1884) 9 App Cas 371, and that in the case of removing a personal representative similar principles should apply. Whether I am right in concluding that Pamela is a trustee; or whether she is no more than a personal representative, the principles are therefore the same. At page 386 Lord Blackburn referred with evident approval to a passage in Story's Equity Jurisprudence:

> "But in cases of positive misconduct, Courts of Equity have no difficulty in interposing to remove trustees who have abused their trust; it is not indeed every mistake or neglect of duty, or inaccuracy of conduct of trustees, which will induce Courts of Equity to adopt such a course. But the acts or omissions must be such as to endanger the trust property or to shew a want of honesty, or a want of proper capacity to execute the duties, or a want of reasonable fidelity."

45.     He continued:

> "It seems to their Lordships that the jurisdiction which a Court of Equity has no difficulty in exercising under the circumstances indicated by Story is merely ancillary to its principal duty, to see that the trusts are properly executed. This duty is constantly being performed by the substitution of new trustees in the place of original trustees for a variety of reasons in non-contentious cases. And therefore, though it should appear that the charges of misconduct were either not made out, or were greatly exaggerated, so that the trustee was justified in resisting them, and the Court might consider that in awarding costs, yet if satisfied that the continuance of the trustee would prevent the trusts being properly executed, the trustee might be removed. It must always be borne in mind that trustees exist for the benefit of those to whom the creator of the trust has given the trust estate."

46.    The overriding consideration is, therefore, whether the trusts are being properly executed; or, as he put it in a later passage, the main guide must be "the welfare of the beneficiaries". He referred to cases in which there was a conflict between trustee and beneficiary and continued:

> "As soon as all questions of character are as far settled as the nature of the case admits, if it appears clear that the continuance of the trustee would be detrimental to the execution of the trusts, even if for no other reason than that human infirmity would prevent those beneficially interested, or those who act for them, from working in harmony with the trustee, and if there is no reason to the contrary from the intentions of the framer of the trust to give this trustee a benefit or otherwise, the trustee is always advised by his own counsel to resign, and does so. If, without any reasonable ground, he refused to do so, it seems to their Lordships that the Court might think it proper to remove him; but cases involving the necessity of deciding this, if they ever arise, do so without getting reported."

47.    He added, however, at page 389:

> "It is quite true that friction or hostility between trustees and the immediate possessor of the trust estate is not of itself a reason for the removal of the trustees. But where the hostility is grounded on the mode in which the trust has been administered, where it has been caused wholly or partially by substantial overcharges against the trust estate, it is certainly not to be disregarded."

48.    The Foundation's application to remove Pamela is mainly based on her conduct of proceedings thus far. It is a striking fact that after the Surrogate had ruled that the Foundation was entitled to receive Agnes' residuary estate (a decision that Pamela knew about) she issued proceedings in the High Court in England in which she was both claimant and defendant, seeking payment of monies from the estate without

notifying the Foundation. She pursued those proceedings until the Chancery order was made, still without notifying the Foundation. As I have said, the claim was based on three categories of expense:

i)   Sums which Pamela said she had incurred on behalf of Agnes during her lifetime;

ii)  Debts which Agnes had contracted but had not paid; and

iii) Sums which Pamela had incurred as Agnes' personal representative and in respect of which she claimed to be entitled to indemnity from the estate.

49.   The first of these categories was a claim as creditor of the estate against the estate. In other words, this was Pamela's personal claim against the estate. The second category is more obscure, but seems also to have been Pamela's personal claim against the estate. The third was a claim in her representative capacity (in effect against the beneficiaries). A pause for thought ought to have led Pamela to realise that there was an obvious conflict of interest between her personal claims and her duties as personal representative. The procedural nonsense of a claim to which she was both claimant and sole defendant ought to have been obvious too. Mr Gibbon pointed out that Pamela was acting as a litigant in person. However, Pamela is an experienced litigant. I do not regard the fact that she was a litigant in person as an excuse. If anything, it counts against her, because a responsible personal representative, with the interests of the estate at heart, would have consulted a lawyer.

50.   Mr Gibbon submitted that Pamela was not obliged to join the Foundation as a defendant to her claims against the estate. He may well be right about that. CPR Part 64.4 says that persons with an interest in or claim against the estate "may" be made parties to the claim. But in my judgment a responsible personal representative, knowing of the Surrogate's decision, and pursuing a personal claim for over £7 million, would have given notice of the claim to the Foundation. In his Order dated 31 January 2006 vacating the domestication order Judge Andrews of the Broward County Court commented that

      "this Court finds that there is strong evidence of fraud upon the court perpetrated by Petitioner in both the proceedings before the High Court and this Court. This Court is further of the opinion that Petitioner, by proceeding as she has, is attempting to circumvent the decision of the Westchester County Surrogate's Court, and the decision of Judge Vonhof of the Palm Beach Court."

51.   Even after all the criticism that has been levelled at Pamela for taking this course, both by the Foundation and Judge Andrews, she still says that she believes that it was appropriate for her to have obtained the Chancery order and that there was no need to inform the Foundation either that she had applied for it or that it had been granted. Mr Gibbon submitted, and I agree, that I should not on a summary application infer that Pamela has acted dishonestly or with deliberate disregard of her duties. But if I do not draw that inference, what is left? The only alternative conclusion that I can draw from this is that Pamela does not understand her responsibilities, and is not willing to learn them. There is no prospect of Pamela's position being any better after a trial.

52.    It is also a striking fact that when Pamela came to domesticate the Chancery order in Florida and New York, she did so in courts which had had no previous experience of this long running and bitter dispute. More than that, when restraining orders had been made against her by the state courts she registered the Chancery order in the Federal Court. This does not encourage me to believe that she will abide by orders of the court.

53.    It is plain that there is intense hostility between Pamela and the Foundation. Pamela is partisan as between the Foundation on the one hand and Carvel-Florida on the other. So far as the Foundation is concerned, the hostility is, in my judgment, grounded on the way in which the trusts have been administered.

54.    Lord Blackburn cited as the guiding principle to the jurisdiction to remove trustees as being "the welfare of the beneficiaries". Mr Barlow submitted:

> "Pamela has wholly disregarded this principle. Her every act has been calculated to promote her own personal interests and to prejudice those of the Foundation. She is in a position of irreconcilable conflict with the principal beneficiary of Agnes' estate and her hostility to the Foundation renders it quite impossible for her to fulfil her fiduciary duties. Her position as personal representative is untenable. She should be removed."

55.    I agree. I will order Pamela to be removed as personal representative. The Foundation has proposed that Mr Guy Greenhous, a solicitor and partner in RadcliffesLeBrasseur, be appointed as personal representative (or judicial trustee). He has consented to act; and has been certified as fit to act. There is no objection to him personally. I will therefore accept the Foundation's proposal.

**Application to set aside**

56.    The second application is an application to set aside the Chancery order. It is made under CPR Part 40.9 which says:

> "A person who is not a party but who is directly affected by a judgment or order may apply to have the judgment or order set aside."

57.    The Foundation is, in my judgment, a person who is directly affected by the order because if it stands it will reduce the value of Agnes' residuary estate. It is therefore entitled to make the application. The rule gives the court a discretion whether or not to set aside the order. In my judgment I should exercise my discretion in favour of the Foundation and set aside the order because:

i)     No notice of the proceedings or the order was given to the Foundation;

ii)    There has been no decision on the merits of the claim;

iii)   There is, to put it no higher, a prima facie case that Pamela is influential in the decision making of Carvel-Florida;

      iv)     In any event the consent to the order was signed by Pamela's mother rather than a wholly disinterested third party; and

      v)     There is nothing to suggest that Pamela disclosed her relationship with Carvel-Florida to the court before it made its order.

58.    I will therefore set aside the order. I will hear argument about what directions (if any) I should give for the future conduct of that action when this judgment is handed down.

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

MR JUSTICE LEWISON

MONDAY the 11ᵗʰ day of JUNE 2007

Claim No: HC06C03337



IN THE ESTATE of AGNES CARVEL deceased

B E T W E E N :

THE THOMAS AND AGNES CARVEL FOUNDATION

Claimant

-and-

(1)    PAMELA CARVEL
(2)    CARVEL FOUNDATION, INC.

Defendants

ORDER

UPON THE APPLICATION of the Claimant by Application Notice dated 8ᵗʰ November 2006

AND UPON HEARING Counsel for the Claimant, for the First Defendant and for the Second Defendant

AND UPON READING the documents recorded on the Court file as having been read

1

AND the Court being of opinion that sufficient cause is shown within the meaning of Section 1(1) of the Judicial Trustees Act 1896 APPOINTS Guy Greenhous, Solicitor of the Supreme Court, of 5 Great College Street, Westminster, London EC4A 1RS ("the judicial trustee") as sole judicial trustee of the Will dated 7th July 1995 of the above-named Agnes Carvel deceased in place of the First Defendant to complete the administration of the deceased's estate

AND IT IS ORDERED

(1) that the First Defendant do forthwith deliver up to the Principal Registry of the Family Division the grant of probate with the said Will annexed granted to her on 2nd October 1998

(2) that the Claimant do deliver a sealed copy of this Order to the Principal Registry of the Family Division

(3) that the First Defendant do forthwith deliver up to the judicial trustee

 (a) all property in her hands which is comprised in the said estate together with all deeds or documents of title relating to property comprised in the said estate and all other papers relating to the said estate; and

 (b) all sums of money comprised in the said estate which are in her hands or under her control

(4) that the First Defendant do by 4.00 pm on 1st October 2007 prepare and deliver to the judicial trustee accounts of the estate from 4th

2

August 1998 (the date of the deceased's death) until the date of this Order

(5)     that until further Order of the Court the judicial trustee shall not without the prior leave of the Court

(a)     make any distribution of capital or income to any beneficiary;

(b)     bring defend or participate in any proceedings on behalf of the estate of the deceased in any jurisdiction

(6)     that subject as aforesaid the judicial trustee be at liberty

(a)     to apply for all such vesting and other consequential orders as may be necessary or expedient; and

(b)     to take all such other steps as he may consider necessary or expedient to collect and administer the assets of the deceased

(7)     that the judicial trustee be authorised to charge and retain out of the assets comprised in the estate of the deceased reasonable remuneration in accordance with section 29 of the Trustee Act 2000 and that the requirements as to the provision of security and the preparation, filing examination and inspection of accounts contained in Rules 6, 9 and 12 of the Judicial Trustees Rules 1983 be dispensed with

(8)     that the judicial trustee do prepare annual accounts of the estate of the deceased and make up the same to the anniversary of this Order

3

(9) that the Orders made by Deputy Master Weir and Master Price on 8th January 2004 and 6th May 2005 in proceedings issued in this Division by the First Defendant on 12th June 2003 (the reference to the record whereof is HC03C02156) ("the 2003 proceedings") be set aside

(10) that the First Defendant be at liberty on giving notice in writing to the judicial trustee and the Claimant to apply to the Master in the 2003 proceedings for directions as to the future conduct of such proceedings, such application not to be heard before 1st October 2007

(11) that notwithstanding paragraph (5)(b) of this Order the judicial trustee be at liberty to apply to be joined as a party and to participate in the 2003 proceedings

(12) that a copy of this Order be lodged in the Court file relating to the 2003 proceedings

(13) that the Claimant do cause copies of this Order and the Judgment herein to be supplied to the Surrogate's Court for the County of Westchester in the State of New York, the District Court for Palm Beach County in the State of Florida and any other Court which is seised of proceedings concerning Agnes' estate

(14) that the Claimant's costs of the action be referred to the costs judge for detailed assessment on the standard basis and that the First Defendant do pay to the Claimant its costs as so assessed

(15) that the First Defendant do by 4.00 pm on 1st October 2007 pay to the Claimant the sum of £100,000 on account of its costs of the

4

action, the said sum so paid to be accounted for by the Claimant on the
detailed assessment of costs directed by paragraph (14) above

(16)   that the parties be at liberty to apply generally

AND the First Defendant having by her Counsel at the conclusion of the
hearing applied for permission to appeal THIS COURT STATES

(a)   that this Order is a final order;

(b)   that subject to the grant of permission to appeal an appeal lies
from this Order to the Court of Appeal;

(c)   that in the event of a refusal by this Court of permission to
appeal any further application for permission to appeal may be made to
the Court of Appeal

AND FURTHER ORDERS

(17)   that the First Defendant's application for permission to appeal
from this Order be refused

(18)   that the First Defendant's time for filing an appeal notice to the
Court of Appeal seeking permission to appeal from this Order be
extended to 4.00 pm on Monday 16th July 2007

5

Claim No: HC06C03337

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

MR JUSTICE LEWISON

MONDAY the 11th day of JUNE 2007

IN THE ESTATE of AGNES CARVEL
deceased

B E T W E E N :

THE THOMAS AND AGNES CARVEL
FOUNDATION
Claimant

- and -

(1)     PAMELA CARVEL
(2)     CARVEL FOUNDATION, INC.
Defendants

_____

ORDER

_____

Herbert Smith LLP,
Exchange House,
Primrose Street,
London EC4A 2HS